NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-88

WICKED-LITE SUPPLY, INC., & another[1]

vs.

WOODFOREST LIGHTING, INC.,[2] & others.[3]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Wicked-Lite Supply, Inc. (Wicked-Lite) purchased approximately 5,500 T5N LED integrated lamps (light fixtures or lights) from Woodforest Lighting, Inc. (Woodforest).  After approximately one-half of the lights were installed by Wicked Watts, Inc. (Wicked Watts), it was discovered that many of them were not working properly.  Kelly Cota, the owner and president of both Wicked Watts and Wicked-Lite (collectively, Wicked), contacted Woodforest about the problem.  When Woodforest provided replacement lights that were not compatible and could

---

[1] Wicked Watts, Inc.

[2] Doing business as Forest Lighting USA.

[3] Ledvance, LLC, and MLS Co., Ltd.

not be installed, Wicked sued Woodforest and its parent company, MLS Co., Ltd. (MLS), for breach of warranty, breach of the implied warranty of merchantability, misrepresentation, and violation of G. L. c. 93A, § 11.[4]

Following a trial in Superior Court, the jury found in favor of Wicked on its breach of warranty claim against Woodforest, and on its claims of misrepresentation and violation of c. 93A against both Woodforest and MLS. The jury found against Wicked on its claim for breach of the implied warranty of merchantability. In a posttrial memorandum and order, the judge credited the jury's findings that both Woodforest and MLS knowingly and willfully engaged in unfair and deceptive acts or practices and entered judgment tripling Wicked's damages under c. 93A. Because Wicked prevailed on its c. 93A claims, the judge also awarded attorney's fees and costs. On appeal, the defendants argue that (1) a transmittal e-mail message from a Woodforest employee, and a test report attached to it stating that a sample of the lights were faulty, were improperly admitted in evidence; (2) the alleged conduct did not rise to

---

[4] The plaintiffs also brought claims against Ledvance, LLC (Ledvance), a company that produced lights for MLS. Ledvance's motion for a directed verdict was allowed as to all claims and Wicked did not file a cross appeal. Consequently, Ledvance is not a party to this appeal.

2

the level of a c. 93A violation; and (3) multiple damages under c. 93A were not warranted. We affirm.

Background. The lights at issue were purchased or replaced between December 2016 and August 2018. After approximately 2,700 lights were installed in various commercial, laboratory, and college spaces in Massachusetts, many of them began to flicker and then fail. At trial, Cota acknowledged that it was "not uncommon . . . to have one or two fixtures fail . . . and . . . fail quickly" by not turning on after installation. However, as Cota went on to explain, she became "alarm[ed] . . . that we started seeing failures increasing," and that the fixtures at issue "started flickering, and then they would eventually burn out." On July 24, 2018, Cota sent an e-mail message to Woodforest and complained. Steven Dore, a Woodforest employee, responded and suggested that the problems were caused by installation or "sine wave" issues. Wicked then checked various project sites for voltage spikes and dimmer concerns but found none. The problems continued after Wicked ruled out site and installation-related issues. Cota testified that "[clients were] calling us back saying [the lights were] failing, they're flickering." She said that she "kept having more and more conversations" with Dore about the issues, who continued to insist that there was no problem. The failures, first seen at two to three sites, now affected five to six different projects

and posed safety issues in places where lights were required to remain on at all times.

Woodforest then offered to replace the lights with a new (second-generation) fixture and sent several of these fixtures to Wicked between June and August 2018. However, the new lights were not the right voltage and were not compatible with the existing lights at the various projects. Thus, despite being sent what were represented as replacements, Wicked could not install them. Cota testified that she repeatedly notified Woodforest of these issues. She stated that on one occasion, "I called them and I said these don't mount together, they are not even the exact same connecting points, . . . [and] they said, well, it's close enough. And I said it's not close enough, it's not going to work." On another occasion, a Wicked employee, Mike Federici, sent an e-mail message to Dore asking, "[c]an we assume that . . . the new version [of the fixtures] cannot be connected to the first version or gen one in series," to which Dore responded "[t]hat's correct."

Faced with increased pressure from her clients and threats of lawsuits, Cota pressed Woodforest for information about what could have caused the lights to fail. On September 18, 2018, Dore sent Cota an e-mail message to which he attached a "test report," dated March 29, 2017, from Applied Technical Services, Incorporated (ATS report or report). The subject of the report

4

concerned testing conducted on eight lamps by ATS to determine the cause of the "problems with flickering." The tests revealed that "[f]ive of the eight lamps were found to be faulty and produced a stroboscopic flicker when powered." In his e-mail message to Cota and Federici, Dore confirmed that "[t]he report pointed out three specific components causing the flickering." He went on to advise her that "we can tell the customer . . . that we have switched to a new vendor with a more reliable component supplier[] to eliminate any high rate of failures." Cota related that upon receiving the message, "she f[e]ll off her chair." As she explained, "I've been in the lighting industry for 32 years. This is a certified test laboratory, independent from [Woodforest], from myself, from everybody. So [Woodforest] took this upon themselves." She then called Dore and accused him of selling her a product "knowing that it was bad." Cota claimed that Dore responded, "I don't know what to say to you . . . [l]et me call [president of Woodforest] Jian Ni and see what we can do."

Additional discussions between Cota and Woodforest did not resolve the issue. Cota testified that she felt like "a hamster on a wheel." At one point, Jian Ni wrote to MLS and stated that the company would not be able to replace the fixtures. He expressed the view that Cota should be compensated, saying: "I think the most viable solution[] is to fully credit them . . .

and offer certain monetary compensation to conclude this issue." Ultimately, Woodforest offered Wicked free fixture replacements, and, if it could not adequately supply them, offered to provide Wicked with lights manufactured by Ledvance, a company recently acquired by MLS. Despite the offer and the previously-noted issues with Woodforest's replacements, Cota testified that she was never provided with anything from Ledvance. Eventually, Wicked replaced the lights with new ones purchased from a different company.

At the close of evidence, MLS, but not Woodforest, moved for a directed verdict, which the judge denied. As noted, the jury found in favor of the plaintiffs for breach of warranty and misrepresentation, but did not find a breach of the implied warranty of merchantability. With respect to the c. 93A claims, which were submitted to the jury on an advisory basis, the jury found that Woodforest and MLS had engaged in unfair or deceptive acts or practices in trade or commerce and that such acts were knowing and willful.[5]

---

[5] Specifically, for each defendant, the jury answered "Yes" to the questions: (1) "Did [plaintiffs] prove that [defendant] engaged in one or more unfair or deceptive acts or practices in trade or commerce?"; (2) "Did [plaintiffs] prove that the unfair or deceptive act(s) or practice(s) . . . were knowing or willful?"

After trial, MLS, but not Woodforest, filed a motion for judgment notwithstanding the verdict, and Wicked moved for findings of fact and rulings of law on the c. 93A counts. Following a hearing, the judge denied MLS's motion, and as previously discussed, adopted the jury's findings that both defendants had knowingly and willfully engaged in unfair or deceptive acts or practices before entering the judgment described above.

Discussion. 1. <u>Admission of the transmittal e-mail message and ATS report</u>.[6] The defendants objected to the admission of Dore's e-mail message and the ATS report at the beginning of the trial. They asserted that both documents contained hearsay, and the report could not be authenticated. The judge overruled the defendants' objections but limited the purpose for which the jury could consider the report to the defendants' states of mind. The judge gave the jury a limiting instruction when the report was introduced during Cota's testimony, as follows:

> "this particular document . . . is admitted for a limited
> purpose, okay? It is not admitted for the truth of the

---

[6] Wicked contends that the arguments regarding the admissibility of the e-mail message and report are waived because (1) as to Woodforest, it did not move for a directed verdict or judgment notwithstanding the verdict, and (2) as to MLS, its motions for a directed verdict and judgment notwithstanding the verdict did not raise the issue. While both points have some validity, the parties have briefed the issue, and we choose to address it.

information contained in it. It is admitted for the purpose of establishing what was known or what the mindset was of [Woodforest], okay, at a particular time, the information known to [Woodforest], not as to the truth of what's contained in it."

When the report was discussed again during Cota's testimony the next day, the judge reiterated, "I'll clarify and remind you, this is not admitted for the truth of the matters contained in it; it's admitted for the purpose of showing knowledge; that is to say, what was known by the parties in connection with this case." Finally, during his final instructions to the jury, the judge again referred to the report and said "[the report] was introduced for a limited purpose; it was not introduced for the truth of the statements contained in the report. Instead, it was admitted on the limited issue of what was known to Woodforest Lighting at the particular time about the particular product." We discern no error.

"We review a trial judge's evidentiary decisions under an abuse of discretion standard." Laramie v. Philip Morris USA Inc., 488 Mass. 399, 414 (2021). An abuse of discretion occurs when the judge makes a clear error of judgment in weighing the relevant factors such that the decision falls outside the range of reasonable alternatives. See Quarterman v. Springfield, 91 Mass. App. Ct. 254, 260, cert. denied, 583 U.S. 1013 (2017).

We first turn to the defendants' hearsay argument. The rule against hearsay prohibits the use of out-of-court

statements as proof of the matter asserted.  See Laramie, 488 Mass. at 415.  However, not every out-of-court statement violates the rule.  Where, as here, the statement at issue is offered to establish a state of mind, it is not admitted for the truth of the matter asserted and therefore is not hearsay.  In this instance, the judge specifically admitted the report not as proof that the lights were faulty but instead to demonstrate that Woodforest was aware of the potential for failure.  See Pardo v. General Hosp. Corp., 446 Mass. 1, 18 (2006) ("[a]n extrajudicial statement is not hearsay when offered to prove that the person to whom it was addressed had notice or knowledge of the contents of the statement" [citation omitted]).  The judge instructed the jury to this end when the report was admitted, again when the report was brought up later in trial, and during his final jury instructions.  See id. at 19 (state of mind evidence properly admitted, and limiting instructions ensured that jury would not find evidence "necessarily true").

As to the e-mail message, contrary to the defendants' assertion that it consisted of hearsay within hearsay, the message was a statement from a party opponent, and its reference to the properly-admitted report had no bearing on its admissibility.  See Hopkins v. Medeiros, 48 Mass. App. Ct. 600, 613 (2000) ("evidence of [defendant's] admission to sufficient facts was admissible as an admission of a party opponent");

9

Mass. G. Evid. § 801(d)(2)(A) (2024) (statement not hearsay where it "is offered against an opposing party and . . . was made by the party").

Next, the defendants argue that neither the e-mail message nor the report was properly authenticated and, consequently, neither document should have been admitted at trial. As an initial matter, it is true, as the defendants assert, that the judge did not make any specific findings regarding authenticity. However, the absence of such findings does not amount to reversible error in the circumstances presented. As regards the e-mail message, it was evident from the record that it originated from a Woodforest employee with whom Cota had regular contact -- via e-mail. After Cota received the message from Dore, she called him and discussed the contents of the e-mail message and report. She told him that he knowingly sold her a defective product, and he responded that he would call Ni and "see what we can do." Dore's statements to Cota acknowledging the contents of the e-mail message served as "confirming circumstances" that allowed the jury to find by a preponderance of evidence that Dore authored it. Commonwealth v. Purdy, 459 Mass. 442, 450 (2011). Accordingly, the admission of the e-mail message was not an abuse of discretion.

The report, however, stands on a different footing. No one from ATS testified, and although Cota's testimony established

10

that she received the report from Dore, there was no evidence to establish that the report was what it purported to be. That said, even if it was error to admit the report, there was sufficient additional properly-admitted evidence on which the jury could find liability and the judge could find that the defendants had violated c. 93A. Apart from the report, Cota's testimony and additional e-mail messages between employees of the parties established that the defendants sent light fixtures that failed, attempted to replace the defective lights with ones that were not compatible -- a fact which the defendants ultimately acknowledged, did not send additional lights after switching to a new vendor, and took no further corrective action even after Ni suggested that a refund was appropriate. In light of this evidence, we cannot conclude that the defendants were materially prejudiced by the admission of the report, which we again note was admitted for only a limited purpose. Accordingly, any error relating to the admission of the report does not warrant reversal. See generally Kace v. Liang, 472 Mass. 630, 646 (2015).

2. General Laws c. 93A. The defendants argue that the judge erred in accepting the jury's advisory verdicts and subsequently concluding that they engaged in unfair and deceptive practices in violation of c. 93A. They contend that their conduct amounted to no more than (or at best) an ordinary

11

breach of contract. They further claim that because the jury found no breach of the implied warranty of merchantability, the jury necessarily rejected the premise that Woodforest knowingly sold a product that it knew or should have known was defective. We conclude otherwise.

"Whether an act or practice violates c. 93A is based on the totality of the circumstances." Connor v. Marriott Int'l, Inc., 103 Mass. App. Ct. 828, 833 (2024). While a mere breach of contract does not amount to a 93A violation, see H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 25 (2022), we have said that practices "do not have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 620 (1994).

In this case, the judge's findings that the defendants had violated c. 93A were based on conduct distinct from any breach of contract or related warranty issue. As the judge explained in his posttrial memorandum and order, Woodforest knew or should have known that the lights were defective, and, despite this knowledge, continued to sell the products to Wicked. Then, its "purported remedy," approved by MLS, was to "knowingly provide alternative fixtures that would not fit and were not suitable for the use to which they were to be put." In addition,

although the judge did not specifically refer to Woodforest's repeated and unfounded assurances that nothing was wrong with the lights, this conduct also establishes a violation of c. 93A. In sum, we agree with the judge that the facts provided a sufficient basis for the award of c. 93A damages. See Baudanza v. Comcast of Mass. I, Inc., 454 Mass. 622, 630 (2009) (we do not substitute our judgment for that of trial judge who observed witnesses).

For similar reasons, we reject the defendants' claim that the evidence was insufficient to support the judge's findings that their unfair and deceptive conduct rose to the level of a willful and knowing violation, such that tripling the damages was justified. "Under G. L. c. 93A, § 11, [a plaintiff] is entitled to multiple (not more than treble and not less than double) damages if [the defendant] acted 'knowingly' or 'wil[l]fully' in violation of [G. L. c. 93A,] § 2." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 475 (1991). A judge's decision to award multiple damages for a violation of c. 93A is "based on the egregiousness of the defendant's conduct" (citation omitted). Hug v. Gargano & Assocs., P.C., 76 Mass. App. Ct. 520, 527 (2010). In reviewing an award of multiple damages under c. 93A, "we are bound by a judge's findings of fact that are supported by the evidence, including all inferences that may reasonably be drawn from the evidence."

13

Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 183 (2013), quoting Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 420 (2005).

As previously noted, the judge did not err in crediting the jury's advisory verdicts, which were based on evidence that Woodforest (1) sold a product which it knew or should have known was defective, (2) misrepresented the underlying problem with the lights for months, and (3) under the direction of MLS, attempted to replace that product with fixtures that they both knew were not suitable. That conduct was sufficiently egregious to warrant the imposition of multiple damages.[7]

Where, as here, the evidence supports the judge's conclusion that the defendants' behavior was intentional and willful, we do not disturb his award of treble damages. See Hug 76 Mass. App. Ct. at 528 ("the trial judge, who is in the best position to view the evidence and assess the credibility of the

---

[7] The defendants' reliance on VMark, 37 Mass. App. Ct. at 623-624, in support of their positions that their efforts "to address and remediate the product issues belie the notion that their conduct required multiple damages," is misplaced. In VMark, supra at 622, we concluded multiple damages were not appropriate because the defendant "acted in good faith in its dealings with [plaintiff], that it fully expected that [the product] would function as represented, and that it was persistently ready and willing, though ultimately unable, to correct [its] shortcomings." By contrast, Woodforest's attempt to remedy the problem did not reflect the type of good faith present in VMark.

14

witnesses, [has] discretion in determining the award"); Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 608 (2007) ("[s]o long as that [willful and knowing] finding stands, an award of multiple damages ineluctably flows from the plain language of the statute").[8]

3. Appellate attorney's fees. The plaintiffs have requested and are entitled to an award of appellate attorney's fees and costs. See G. L. c. 93A, § 11. They may submit a petition for fees and costs with supporting materials, in accordance with the procedure set forth in Fabre v. Walton, 441 Mass. 9, 10-11 (2004), within fourteen days of the date of this decision. If the defendants choose to respond, they shall have fourteen days within which to do so.

Judgment affirmed.

By the Court (Vuono, Hershfang & Tan, JJ.[9]),

Clerk

Entered: May 19, 2025.

---

[8] Moreover, contrary to the defendants' assertion, the absence of specific subsidiary findings with regard to the c. 93A claims does not undermine the judge's conclusions. "A judge need not make an express finding that a person wil[l]fully or knowingly violated G. L. c. 93A, § 2, as long as the evidence warrants a finding of either" (citation omitted). Anthony's Pier Four, 411 Mass. at 475.

[9] The panelists are listed in order of seniority.

15